UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION
www.flmb.uscourts.gov

In re:                                                        Case No. 8:14-bk-09521-MGW
                                                              Chapter 11
Bayou Shores SNF, LLC,

        Debtor.

_____/

**MEMORANDUM OPINION**
**AND ORDER ON CONFIRMATION**

        The Court can only confirm a debtor's proposed plan if it is feasible. Here, the Debtor,

which operates a skilled nursing facility that derives 90% of its revenue from Medicare and

Medicaid patients, has proposed a chapter 11 plan that is funded from its continuing operations.

All of the creditors in the case have voted in favor of the plan. But the United States Department

of Health & Human Services ("HHS") has objected that the plan is not feasible because it says

the Debtor's Medicare provider agreement was terminated prepetition, and as a consequence, so

was its Medicaid provider agreement. This Court must now decide whether the Debtor's plan is

feasible.

        The Court concludes the plan is feasible because the Debtor has the right to assume the

Medicare provider agreement under Bankruptcy Code § 365. Although HHS, through the Center

for Medicare & Medicaid Services ("CMS"),[1] gave the Debtor notice it was terminating its

Medicare provider agreement prepetition, that termination was not complete and irreversible

until the appeals process was complete. And the appeals process was not completed prepetition.

For that reason, the Medicare provider agreement can be assumed under Bankruptcy Code § 365,

which means the Debtor's Medicaid provider agreement does not terminate as a matter of law.

_____

[1] CMS is the operating component of HHS charged with administering the Medicare and Medicaid programs.

Because the Debtor's Medicare and Medicaid provider agreements remain in effect, the Court concludes the Debtor's plan is feasible and should be confirmed.

## Background

### *The Debtor cares for patients with severe psychiatric conditions*

The Debtor owns and operates a 159-bed skilled nursing facility known as the Rehabilitation Center in St. Petersburg, Florida.[2] The Debtor currently has 109 patients, most of whom have Alzheimer's, dementia, or other serious psychiatric conditions.[3] The Debtor is one of the few facilities—if not the only one—in the area that is capable of meeting the needs of patients with challenging psychiatric needs.[4]

### *The Debtor relies on Medicare and Medicaid revenue*

All but a handful of the Debtor's patients are on Medicaid or Medicare. Medicare, of course, is a federal program that provides payment for skilled nursing services for aged or disabled individuals. Similarly, Medicaid is a joint federal and state program that provides medical assistance to low-income individuals who are disabled. Over 90% of the Debtor's revenue is derived from Medicare and Medicaid.[5]

### *CMS and AHCA conduct surveys to ensure providers are complying with the Medicare and Medicaid program requirements*

To receive payment under the Medicare and Medicaid programs, a skilled nursing facility such as the Debtor must comply with the requirements set forth in 42 C.F.R. Part 483, Subpart B. Skilled nursing facilities like the Debtor are subject to standard, special, and other surveys by the

---

[2] Doc. No. 250 at ¶ 4; Doc. No. 266 at ¶ 4.

[3] Doc. No. 250 at ¶ 4; Ex. 20 at 33-34 & 38.

[4] Ex. 20 at 29.

[5] Doc. No. 250 at 2 n.1; Doc. No. 266 at 2 n.1.

State or CMS—depending on whether the facility participates in one or both programs—to certify they are in compliance with applicable federal law.[6] If a skilled nursing facility is certified to be in noncompliance, then CMS may terminate any Medicare provider agreements that are in effect at the time or apply alternative remedies instead of—or in addition to—termination.[7]

In determining which remedies to apply, CMS must determine the seriousness of the deficiency that has caused the facility to be noncompliant.[8] The seriousness of a deficiency generally ranges from "no actual harm with a potential for minimal harm" to "immediate jeopardy to resident health or safety."[9] "Immediate jeopardy" means "a situation in which the provider's noncompliance with one or more requirements of participation has caused, or is likely to cause, serious injury, harm, impairment, or death to a resident."[10] Regardless of which remedies CMS decides to apply, a skilled nursing facility must complete a "plan of correction" that describes the actions the facility will take to correct any cited deficiencies and the date by which the deficiencies will be corrected.[11]

*The Debtor is cited for three deficiencies*

Between February 2014 and July 2014, the Debtor was cited for deficiencies—and determined to be in noncompliance—three separate times.[12] The first deficiency had to do with

---

[6] 42 C.F.R. § 488.308.

[7] 42 C.F.R. § 488.330(b)(2).

[8] 42 C.F.R. § 488.404(a). The possible remedies (instead of or in addition to termination of the provider agreement) include: temporary management, denial of payment, civil monetary penalties, state monitoring, transfer of residents, closure of the facility, and directed plan of correction. 42 C.F.R. § 488.406(a).

[9] 42 C.F.R. § 488.404(b).

[10] *Id.*

[11] 42 C.F.R. § 488.408(f).

[12] Ex. 20 at 19-28.

recordkeeping. A February 2014 survey revealed that, as a result of the facility's transition to electronic medical records, some of the residents' files contained conflicting entries with respect to "Do No Resuscitate Orders."[13] The second deficiency had to do with admissions procedures. In March 2014, an individual with a history of sexual exploitation or abuse was admitted to the Debtor's facility.[14] Staff members, however, failed to identify this threat and placed him in a room with another resident.[15] Fortunately, the patient with the history of abuse—who was in the facility for less than 24 hours—did not touch or otherwise harm the other resident. The third deficiency had to do with facility security. In July 2014, a resident on the Debtor's second-floor secure unit left the facility with visitors and was found unharmed on a nearby street corner fifteen minutes later.[16] Although no resident was hurt in any of the three incidents, the Debtor was nevertheless cited for "immediate jeopardy" on each occasion.[17]

*The Debtor is brought back into substantial*
*compliance after the first two deficiencies*

The Debtor immediately cured the first two deficiencies.[18] In the case of the "Do Not Resuscitate" orders, the Debtor made sure that the orders for each resident matched.[19] If a patient had a "Do Not Resuscitate Order," the facility made sure the physician order said the patient was not to be resuscitated.[20] As for the admissions procedures, the Debtor wrote a new set of policies

---

[13] *Id.* at 20-21.

[14] *Id.* at 21.

[15] *Id.* at 21-22.

[16] *Id.* at 24-25.

[17] *Id.* at 19-28.

[18] *Id.* at 20-23.

[19] *Id.* at 21.

[20] *Id.*

and procedures governing abuse of residents.[21] After the Debtor cured the first two deficiencies,

CMS revisited the facility and determined the Debtor was in substantial compliance.[22] On May

29, 2014, CMS notified the Debtor it was in substantial compliance with the Medicare and

Medicaid requirements as of May 13, 2014.[23]

*The Debtor immediately cures the third deficiency*

As with the first two deficiencies, the Debtor immediately cured the third deficiency.

Specifically, the Debtor implemented an entirely new system for screening and assessing patients

for potential elopement issues and changed the procedure for guests and patients to access the

facility's secure unit.[24] The Debtor also took the additional step of hiring a third-party

consultant—David Hoffman & Associates—to conduct an extensive review of the corrective

measures the Debtor had taken and determine whether the Debtor had been brought back into

substantial compliance.[25] On July 17, 2014, just one week after the survey that led to the third

deficiency, the Debtor provided CMS with a detailed list of the steps it had taken to remove the

"immediate jeopardy" and bring its facility back into substantial compliance.[26] Rather than revisit

the facility to certify it was in substantial compliance, as is apparently customary where there is

no actual harm to residents, CMS instead opted to terminate the Debtor's Medicare provider

agreement.[27]

---

[21] *Id.* at 22.

[22] *Id.* at 23.

[23] Ex. 2.

[24] Exs. 4 & 5; *see also* Ex. 20 at 23-24.

[25] Doc. No. 250 at ¶¶ 10-11; *see also* Ex. 20 at 25-27.

[26] Exhibit 4; *see also* Ex. 20 at 25. The Debtor had apparently implemented the corrective measures as of July 17, 2014. Hoffman then reviewed those corrective measures on July 29-30, 2014. Doc. No. 250 at ¶¶ 10-11.

[27] Ex. 20 at 27-28, 32 & 48-49; Doc. No. 250 at ¶ 12.

*CMS terminates the Debtor's Medicare provider agreement*

On July 22, 2014, CMS notified the Debtor that it was terminating the Debtor's Medicare provider agreement effective August 3, 2014, which would also result in termination of the Debtors' Medicaid provider agreement.[28] The Debtor appealed the termination of its Medicare provider agreement and requested an expedited hearing before an administrative law judge. The appeal of the decision to terminate the provider agreement, however, did not prevent CMS from denying payment to the Debtor, which would have set a catastrophic chain of events in motion: denial of payment would have caused the Debtor to default under its lease, default under its lease would have forced the Debtor to close its facility, closure of the facility would have forced the transfer of the Debtor's patients, many of whom would have had no place to go or would have potentially been harmed by the transfer.[29]

*The district court temporarily enjoins CMS*
*from terminating the Medicare provider agreement*

So on August 1, 2014, two days before the Medicare provider agreement was terminated, the Debtor sought and obtained an ex parte temporary restraining order from district court that enjoined CMS from terminating the agreement through August 15, 2014.[30] HHS then moved to dissolve the temporary restraining order based on the district court's lack of subject-matter jurisdiction.[31] According to HHS, 42 U.S.C. § 405 mandates that the Debtor exhaust all of its administrative remedies before it can bring a claim under the Medicare statute in district court. In particular, 42 U.S.C. § 405(h) precluded the district court from (i) reviewing an agency decision

---

[28] Ex. 3.

[29] Exhibit 20 at 29-32.

[30] The Debtor filed an action in district court for the Middle District of Florida (Tampa Division) styled *Bayou Shores SNF, LLC v. Sylvia Mathews Burwell*, Case No. 8:14-cv-1849-T-33-MAP.

[31] Dist. Ct. Doc. No. 22.

before all administrative remedies were exhausted; or (ii) taking jurisdiction over a Medicare-related claim against the United States under 28 U.S.C. § 1331, which grants district courts original jurisdiction over all actions arising under the laws of the United States.[32] The district court agreed that it lacked subject-matter jurisdiction over the dispute because the Debtor had not exhausted its administrative remedies, and as a consequence, it dissolved its temporary restraining order on August 15, 2014.[33]

*The Debtor files for bankruptcy*

Mere hours after the district court dissolved the temporary restraining order, the Debtor filed this chapter 11 case. A week later, the Debtor sought a ruling from this Court that the automatic stay precluded termination of its Medicare provider agreement.[34] At the conclusion of a final evidentiary hearing on the Debtor's motion, this Court enjoined termination of the Medicare provider agreement pending completion of the administrative appeals process. Since then, the Debtor has fast-tracked this case to confirmation, proposing a plan within four months of filing this case.[35]

The Debtor's proposed plan enjoys the support of all of the creditors in the case, including a secured lender holding an $11 million claim and unsecured creditors holding more than $2 million in claims.[36] The plan also satisfies all of the requirements of Bankruptcy Code § 1129(a) with the exception of perhaps one: feasibility. HHS objects that confirmation is not feasible because the Debtor relies almost exclusively on Medicare and Medicaid for revenue, and

---

[32] *Id.*

[33] Dist. Ct. Doc. No. 35.

[34] Doc. No. 25.

[35] Doc. Nos. 185 & 186.

[36] Doc. No. 249-1.

those agreements have (or will be) terminated.[37] HHS also objects to the Debtor's attempt to assume the Medicare provider agreement based on its purported prepetition termination.[38] This Court must now determine whether the Debtor's proposed plan is feasible in light of that purported termination.

## Conclusions of Law

### The Court has jurisdiction over the parties' Medicare-related dispute

As a threshold matter, HHS contends that this Court lacks subject-matter jurisdiction over the parties' dispute. According to HHS, "no court has any jurisdiction over any aspect of a Medicare determination, other than to perform a prescribed form of judicial review of a final administrative decision by the Secretary."[39] Because of that, HHS reasons that the Debtor is precluded from raising any challenge to the termination of its Medicare provider agreement before this Court. HHS's argument, however, misses the mark.

It is true that federal courts are generally precluded from exercising federal question jurisdiction over Medicare issues.[40] The statute the district court relied on in dissolving the temporary restraining order—and the statute HHS presumably relies on here—says as much:

> The findings and decision of the Commissioner of Social Security after a hearing shall be binding upon all individuals who were parties to such hearing. No findings of fact or decision of the Commissioner of Social Security shall be reviewed by any person, tribunal, or governmental agency except as herein provided. No action against the United States, the Commissioner of Social

---

[37] HHS contends its Medicare provider agreement has already been terminated. And the parties generally agree that AHCA is obligated to terminate its Medicaid provider agreement once the Medicare provider agreement has been terminated. But there is some question whether termination of the Medicaid provider agreement occurs by operation of law or requires some other action by AHCA.

[38] Doc. Nos. 229 & 255.

[39] Doc. No. 277 at 2.

[40] 42 U.S.C. § 405(h).

> Security, or any officer or employee thereof shall be brought under section 1331 or 1346 of Title 28 to recover on any claim arising under this subchapter.[41]

But this Court's jurisdiction is not based on 28 U.S.C. § 1331 or § 1346.

This Court has independent grounds for exercising jurisdiction: 28 U.S.C. § 1334. Under § 1334, this Court has jurisdiction over all civil proceedings arising under title 11, arising in a case under title 11, or related to a proceeding under title 11. This bankruptcy case, of course, arises under title 11.[42] Confirmation is a contested matter that arises in a case under title 11. And any dispute over the Debtor's ability to assume the Medicare provider agreement is "related to" this title 11 case since the outcome of that dispute could conceivably have an effect on the Debtor's bankruptcy estate.[43] Accordingly, this Court has subject matter jurisdiction over this case, confirmation, and the parties' dispute over whether the Debtor has the authority to assume its Medicare provider agreement under 28 U.S.C. § 1334(b).

In fact, the court in *First American Health Care of Georgia, Inc. v. HHS* recognized that bankruptcy courts have jurisdiction over some Medicare-related disputes under 28 U.S.C. § 1334.[44] In *First American*, the Debtor filed an adversary proceeding seeking turnover of certain periodic income payments it claimed it was entitled to under the Medicare program. HHS moved to dismiss the adversary proceeding because 42 U.S.C. § 405(h) expressly precluded federal

---

[41] *Id.*

[42] Technically, the district court for this district has subject-matter jurisdiction over these proceedings. The district court is statutorily empowered to refer all of these proceedings to this Court, which it has done by a standing order of reference.

[43] A bankruptcy court has "related to" jurisdiction if the outcome of a proceeding could conceivably have an effect on the estate being administered. *Miller v. Kemira (In re Lemco Gypsum, Inc.)*, 910 F.2d 784, 788 (11th Cir. 1990) (adopting the test articulated in *Pacor, Inc. v. Higgins*, 743 F.2d 984, 994 (3d Cir. 1984)).

[44] 208 B.R. 985, 988 (Bankr. S.D. Ga. 1996). The Court later vacated its ruling based on a settlement agreement between the parties. *First Am. Health Care of Georgia, Inc. v. HHS*, 1996 WL 282149 (Bankr. S.D. Ga. 1996). But that does not change the bankruptcy court's analysis, which this Court finds persuasive.

9

courts from exercising federal question jurisdiction over Medicare claims.[45] In denying HHS's motion to dismiss, the *First American* court acknowledged that 42 U.S.C. § 405(h), as originally drafted, precluded bankruptcy jurisdiction over all Medicare disputes. But the Court correctly observed that Congress passed 28 U.S.C. § 1334 in 1984, which conferred bankruptcy jurisdiction on the district court, and nothing in 42 U.S.C. § 405(h) precludes a court from exercising bankruptcy jurisdiction over Medicare disputes under 28 U.S.C. § 1334.[46]

The Court is aware that some courts have held that omission of 28 U.S.C. § 1334 was essentially a scrivener's error.[47] Those courts begin by observing that 42 U.S.C. § 405(h) previously precluded federal courts from exercising all jurisdiction—including bankruptcy jurisdiction—over Medicare-related claims by prohibiting any action under "section 24 of the Judicial Code of the United States."[48] Section 24 previously contained virtually all of the jurisdictional grants to the district court, including bankruptcy jurisdiction.[49] In 1984, Congress replaced the reference to "section 24" with the phrase "section 1331 or 1346." Since the legislative history regarding that amendment provides the amendment was not to be "construed as changing or affecting any right, liability, status, or interpretation which existed" previously, some courts have ruled that Congress intended 42 U.S.C. § 405(h) to preclude the exercise of bankruptcy jurisdiction under 28 U.S.C. § 1334.[50]

---

[45] *Id.* at 987.

[46] *Id.* at 988-89.

[47] *See, e.g., In re St. Johns Home Health Agency, Inc.*, 173 B.R. 238, 244 (Bankr. S.D. Fla. 1994).

[48] *Id.* at 244.

[49] *Id.*

[50] *Id.*

There is one problem with that view: This Court is not free to consider the legislative history of a statute when the statute's text is plain and unambiguous.[51] Here, the text of 42 U.S.C. § 405(h) is plain and unambiguous. It plainly provides that federal courts are precluded from exercising jurisdiction on only two bases: 28 U.S.C. §§ 1331 and 1346. Because 42 U.S.C. § 405(h), by its terms, does not preclude this Court from exercising jurisdiction under 28 U.S.C. § 1334, this Court has subject-matter jurisdiction.

The only plausible argument against this Court having subject-matter jurisdiction is the second sentence of 42 U.S.C. § 405(h), which limits the ability of federal courts to review the findings of fact or an agency decision. Of course, that is not what this Court is doing. HHS had made it plain throughout its various filings in this case that CMS's decision to terminate the Debtor's Medicare provider agreement—the central issue in this case—is not subject to appeal.[52] The only properly appealable issue is CMS's determination that the Debtor was in noncompliance with the Medicare program requirements. But this Court, as part of its executory contract analysis discussed below, assumes that the Debtor was, in fact, in noncompliance. Because this Court assumes the Debtor was in noncompliance, it is not reviewing any findings of fact or agency decision, and as a consequence, 42 U.S.C. § 405(h) does not preclude this Court from considering whether the Debtor can assume its Medicare provider agreement under Bankruptcy Code § 365.

---

[51] *Circuit City Stores, Inc. v. Adams*, 532 U.S. 105, 118 (2001) (refusing to examine legislative history where the face of the statutory provision was unambiguous); *Garcia v. Vanguard Car Rental USA, Inc.*, 540 F.3d 1242, 1247 (11th Cir. 2008) (explaining that courts "may consult legislative history to elucidate a statute's ambiguous or vague terms, but legislative history cannot be used to contradict unambiguous statutory text or to read an ambiguity into a statute which is otherwise clear on its face"); *CBS Broad., Inc. v. EchoStar Commc'ns Corp.*, 265 F.3d 1193, 1213 (11th Cir. 2000) (explaining that "resort to legislative history is unnecessary, and indeed, improper, where the statute's terms are plain and unambiguous").

[52] Doc. No. 277 at 6.

<u>The Debtor can assume the Medicare provider agreement</u>

Under Bankruptcy Code § 365, a debtor may assume an executory contract. The Bankruptcy Code does not define "executory contract." In the absence of a definition, courts have generally followed two approaches to determining whether a contract is executory. Under the first approach, proposed by Professor Vern Countryman, a contract is executory if it is so far unperformed that the failure of either party to complete performance would constitute a material breach of the contract.[53] Under the second approach, aptly named the "functional approach," courts "abandon the traditional focus on the 'executoriness' of contracts in bankruptcy in favor of a more practical, functional approach."[54] Regardless of which test is applied, though, the majority of courts have concluded that Medicare provider agreements are executory contracts, a proposition HHS does not appear to dispute.[55] What would otherwise be an executory contract, however, cannot be assumed under Bankruptcy Code § 365 if the contract was terminated pre-petition because there is nothing left for the Debtor to assume.

The central issue in this bankruptcy case is whether the Debtor's Medicare provider agreement was terminated prepetition. According to HHS, the Medicare provider agreement was terminated on August 3, 2014—the date specified in HHS's July 22 notice. The Debtor, however, contends the agreement could not have been terminated prepetition because the right to terminate the agreement expired when the Debtor brought its facility back into substantial

---

[53] *Walton v. Clark & Washington, P.C.*, 454 B.R. 537, 543 (Bankr. M.D. Fla. 2011).

[54] Bankruptcy Law Manual § 9B:3 (5th ed. 2014); *see also Clark & Washington*, 454 B.R. at 543 (explaining that "[u]nder the functional approach, a court looks to the benefits a debtor and its estate would gain if a contract is assumed or rejected.").

[55] *In re University Med. Center*, 973 F.2d 1065, 1075 n.13 (3d Cir. 1992); *In re Monsour Med. Center*, 11 B.R. 1014, 1018 (W.D. Pa. 1981); *In re Vitalsigns Homecare, Inc.*, 396 B.R. 232, 239 (Bankr. D. Mass. 2008); *In re Heffernan Memorial Hosp. Dist.*, 192 B.R. 228, 231 (Bankr. S.D. Cal. 1996).

compliance, which was on July 18, 2014. The Court concludes the Debtor is correct (i.e., the Medicare provider agreement was not terminated) but for the wrong reason.

The Debtor relies on 42 C.F.R. § 488.454, entitled "Duration of Remedies," in support of its argument.[56] That regulation does provide that certain remedies HHS is entitled to invoke do expire when a revisit by CMS confirms that facility has been brought back into substantial compliance.[57] Expiration of certain remedies can even predate a revisit if the facility can supply HHS with acceptable documentation showing the facility was in substantial compliance at some point before the revisit survey.[58] But as HHS correctly points out, the regulation the Debtor relies on deals with "alternative remedies" other than termination.[59]

In the Court's view, the answer is much simpler. In order for a prepetition termination of contract to cut off a debtor's rights under § 365, the termination must be complete and not subject to reversal.[60] Here, the Debtor had a right to appeal termination of the provider agreement. While that appeal may be limited in scope, the fact remains that termination of the provider agreement is not complete—and is, in fact, subject to reversal—until the appeals process is complete. Because the appeals process was not complete before this case was filed, the contract was not "terminated" prepetition for purposes of § 365.

Concluding that a Medicare provider agreement is "terminated"—for purposes of § 365—before the appeals process is complete would lead to absurd results. Consider the

---

[56] Doc. No. 278 at 18-21.

[57] 42 C.F.R. § 488.454(a)(1)-(2).

[58] 42 C.F.R. § 488.454(e).

[59] Doc. No. 277 at 2-4.

[60] *In re Fontainebleau Hotel Corp.*, 515 F.2d 913, 915 (5th Cir.1975); *see also Moody v. Amoco Oil Co.*, 734 F.2d 1200, 1212 (7th Cir. 1984); *In re Bricker*, 43 B.R. 344, 347 (Bankr. D. Ariz. 1984).

following hypothetical: a debtor that operates a skilled nursing facility has its Medicare provider

agreement terminated because it was improperly cited for noncompliance. The debtor

immediately appeals the finding of noncompliance. But because CMS stops payment for

Medicare residents, the debtor is forced to file for bankruptcy. If the Court were to adopt HHS's

view, the debtor in that hypothetical scenario could never assume its Medicare provider

agreement since it is highly unlikely the appeals process will be complete before the debtor files

for bankruptcy. The only way to preserve a debtor's right to appeal a finding of noncompliance

is to consider a Medicare provider agreement terminated—for purposes of § 365—once the

appeals process is complete.

Here, the appeals process was not complete prepetition. So termination of the Medicare

provider agreement in this case was not complete and irreversible as of the petition date. For that

reason, the Medicare provider agreement is subject to being assumed. The only remaining

question is whether the Debtor satisfies the requirements for assuming the provider agreement

under Bankruptcy Code § 365.

To assume an executory contract that is in default, a debtor must prove that it can

promptly cure the default and provide adequate assurance of future performance.[61] Although

HHS has challenged the Debtor's right to assume the Medicare provider agreement, it has made

no effort to challenge the Debtor's contention that it has cured the existing default and provided

adequate assurances of future performance, instead deciding to rely solely on its argument the

agreement cannot be assumed because it was terminated prepetition.[62] HHS also appears to be

arguing—at least implicitly—that the § 365 requirements do not apply to Medicare provider

---

[61] 11 U.S.C. § 365(b); *In re Chapin Revenue Cycle Mgmt.*, 343 B.R. 728, 730 (Bankr. M.D. Fla. 2006).

[62] Doc. No. 255.

agreements because a skilled nursing facility or other provider has no right to cure a deficiency. The Court is sympathetic to HHS's argument, but as the Third Circuit Court of Appeal recognized in *In re University Medical Center* over twenty years ago, "Congress' failure to legislate special treatment for the assumption or rejection of Medicare provider agreements indicates that assumption of these agreements, like that of other executory contracts, should be deemed subject to the requirements of section 365, unless and until Congress decides otherwise."[63]

Given the unrefuted evidence at confirmation, the Court easily concludes the Debtor has satisfied the requirements for assuming the Medicare provider agreement. It cannot be disputed—given CMS's notice that the Debtor was in substantial compliance as of May 13, 2014—that the Debtor previously cured the initial two deficiencies in a timely matter. That leaves only the third deficiency. The Debtor offered into evidence the "allegation of compliance" it submitted to CMS on July 17 & 28, 2014 that outlines the steps it took to cure the final deficiency and remove any immediate jeopardy.[64] As part of the corrective measures it took, the Debtor retained a third-party consultant (David Hoffman) who has concluded that the Debtor is currently in substantial compliance with the Medicare program requirements and that the Debtor's patients are being adequately cared for.[65]

Hoffman's conclusions are consistent with the opinions offered by the Patient Care Ombudsman. At the outset of this case, the Court issued an order to show cause to determine whether it was necessary to appoint a patient care ombudsman for the protection of the Debtor's

---

[63] 973 F.2d 1065, 1077 (3d Cir. 1992).

[64] Exs. 4 & 5.

[65] Doc. No. 250 at ¶¶ 10 & 11; Ex. 20 at 44-49.

patients.[66] Ultimately, the Court directed the U.S. Trustee to appoint a patient care ombudsman to monitor the quality of patient care and represent the interests of patients in this case. The U.S. Trustee appointed Robert Rosenthal, president of Health Care Management Specialist, Inc., as Patient Care Ombudsman.[67] So far, the Patient Care Ombudsman has issued two reports indicating that the Debtor is adequately and satisfactorily providing for the health and welfare of the Debtor's patients.[68] Significantly, HHS opted not to offer any evidence—presumably because it could not—that the Debtor is not currently in substantial compliance with the Medicare program requirements (i.e., that the Debtor has not cured the prepetition default).

And the Court is persuaded that the Debtor has provided adequate assurances of future performance. In part, those assurances are based on the corrective actions the Debtor has taken to cure the previous deficiencies and the fact that the Debtor has been satisfactorily and adequately providing for patients' health and welfare under the watchful eye of the Patient Care Ombudsman since this case was filed. It is also based on the fact that the Debtor has retained Hoffman in an ongoing role to evaluate the Debtor's regulatory compliance and Hoffman's willingness to remain on as an advisor as long as necessary to ensure the Debtor is adequately and satisfactorily protecting its residents and complying with applicable regulations. Not to mention, HHS has again failed to offer any evidence refuting the Debtor's ability to perform in

---

[66] Doc. No. 36.

[67] Doc. No. 97. Although Rosenthal is not a doctor or nurse, he has extensive experience operating healthcare and assisted living facilities. AHCA has previously recommended Rosenthal as a receiver for a number of assisted living and skilled nursing facilities. And AHCA submitted his name to the U.S. Trustee for consideration in this case, as well. Because Rosenthal is not a medical professional, the Court authorized him to hire healthcare assistants (such as registered nurses and social workers), including RB Health Partners, Inc., to assist him in his review of the Debtor's operations.

[68] Doc. No. 178-1 at 21; Doc. No. 252 at 17.

the future. Accordingly, the Court concludes the Debtor has satisfied the requirements of § 365 and is permitted to assume its Medicare provider agreement.

<u>The Debtor's plan is feasible even though AHCA<br>indicates it intends to deny renewal of the Debtor's license</u>

The only remaining issue that needs to be considered—even though not raised in an objection to confirmation—is whether the Debtor's plan is feasible despite the fact that AHCA has indicated it intends to seek revocation or deny renewal of the Debtor's nursing home license. Back in June, after the second deficiency had been cited and the facility had been brought back into substantial compliance, AHCA filed an administrative complaint seeking to revoke the Debtor's license.[69] That administrative proceeding has since been abated. But in the meantime, the Debtor filed an application to renew its license. AHCA says it intends on denying the Debtor's application to renew its license, and more recently, AHCA asked the Court to modify its injunction to permit AHCA to either deny the Debtor's license renewal application or invoke the administrative process to revoke the Debtor's license since neither action is prohibited by the automatic stay.[70]

AHCA appears to raise two grounds for refusing to renew or seeking to revoke the Debtor's license. First, AHCA says Florida law requires that it deny renewal of or revoke the Debtor's license because its Medicare and Medicaid provider agreements have been terminated. Second, AHCA says the three deficiencies previously discussed are grounds for both refusing to renew and revoking the Debtor's license. It appears AHCA is correct that refusing to renew the Debtor's license on either ground, at least theoretically, does not run afoul of the automatic stay.

---

[69] Doc. No. 246-3.

[70] Doc. No. 246.

As AHCA contends, Bankruptcy Code § 362(b)(4) does, in fact, except from the automatic stay actions to enforce a state's police or regulatory powers. In determining whether a government's actions qualify as police powers, courts generally apply the "pecuniary" purpose and "public policy" tests.[71] Under those tests, courts consider whether the government action is intended to protect the public safety or welfare or effectuate public policy, on the one hand, or protect the government's pecuniary interest or adjudicate private rights, on the other hand:

> There are two tests for determining whether agency actions fit within the section 362(b)(4) exception: (1) the "pecuniary purpose" test and (2) the "public policy" test. Under the pecuniary purpose test, the court determines whether the government action relates primarily to the protection of the government's pecuniary interest in the debtor's property or to matters of public safety and welfare. If the government action is pursued solely to advance a pecuniary interest of the governmental unit, the stay will be imposed. The public policy test "distinguishes between government actions that effectuate public policy and those that adjudicate private rights."[72]

AHCA says its actions satisfy both tests because it is attempting to protect the public safety and welfare and effectuate public policy by denying the Debtor's license renewal application or seeking to revoke the Debtor's license.

The Court agrees that AHCA's refusal to renew or intent to revoke the Debtor's license is an attempt to protect the public safety and welfare. That is perhaps best illustrated by comparing AHCA's actions to those of HHS. In enjoining HHS from terminating the Debtor's Medicare provider agreements, the Court reasoned, in part, that HHS's actions did not fall within the "police powers" exception to the automatic stay.[73] That was because it was apparent to the Court that HHS was only seeking to protect its pecuniary interest in terminating the Debtor's Medicare

---

[71] *In re Pollock*, 402 B.R. 534, 536-38 (Bankr. N.D.N.Y. 2009); *In re Allegheny Health, Educ. Research Found.*, 252 B.R. 309, 327 (W.D. Pa. 1999); *In re Selma Apparel Corp.*, 132 B.R. 968, 969-70 (Bankr. S.D. Ala. 1991).

[72] *Universal Life Church, Inc. v. United States*, 128 F.3d 1294, 1297 (9th Cir. 1997) (internal citations omitted).

[73] Ex. 20 at 89-91.

provider agreement. After all, HHS made no attempt to shut down the Debtor's facility. As far as HHS was concerned, the Debtor could continue to operate its facility and provide care for its patients; HHS simply was not going to pay for it. By contrast, by refusing to renew the Debtor's license, AHCA is essentially attempting to shut down the Debtor's facility because it believes the Debtor's operations are jeopardizing the patients' safety and welfare. While it may be an open question whether shutting down the Debtor's facility is in the best interest of its patients, there can be no question the attempt to shut it down is an effort by AHCA to protect what it believes is in the best interests of the patients' safety and welfare.

But the Court concludes that the Debtor's plan is still feasible notwithstanding AHCA's unwillingness to renew the Debtor's license. For starters, AHCA is collaterally estopped from raising the first ground—i.e., termination of the Medicare and Medicaid provider agreements— as a basis for refusing to renew or seeking to revoke the Debtor's license. This Court has ruled that the Debtor has the right to assume the Medicare provider agreement. And the only basis for terminating the Medicaid provider agreement was that the Medicare provider agreement had been terminated. Since that is no longer the case, the Medicaid provider agreement remains in effect. So the only grounds for refusing to renew or seeking to revoke the Debtor's license are the three deficiencies the Debtor has previously been cited for.

Under Florida law, AHCA does have the right to revoke the Debtor's license if the Debtor has been cited for two "class 1 deficiencies" arising from unrelated circumstances during the same survey or from separate surveys during a 30-month period.[74] AHCA contends that the three deficiencies the Debtor has been cited for constitute "class 1 deficiencies" under Florida law. As a result AHCA contends it is required to revoke or deny renewal of the Debtor's license.

---

[74] § 400.121(3)(c)-(d), Fla. Stat.

But Florida's Medicaid statutes provide additional protections that are not afforded under the Medicare regulations.

Critically, under the Medicare regulations, the Debtor has no right to challenge the termination of a Medicare provider agreement. The Debtor can challenge the underlying finding of noncompliance that gave rise to termination; but once noncompliance has been established, it appears the Debtor cannot challenge termination of the provider agreement. Florida's Medicaid statutes are different. Under section 400.121, Florida Statutes, the Debtor has the right to present factors that mitigate against revocation or nonrenewal of its license.

Although this Court has no say on whether revocation is appropriate under the circumstances—that decision is up to AHCA under section 400.121, Florida Statutes—it is apparent to the Court that there are a number of mitigating factors that could reasonably lead to the conclusion revocation is not appropriate. For one, the three deficiencies were isolated incidents, and each of them was cured immediately. Moreover, the Debtor has been operating its facility for the last five months in apparent substantial compliance with the Medicare and Medicaid requirements and, according to the Patient Care Ombudsman, in a manner that adequately and satisfactorily provides for the patients' health and welfare.[75] Finally, and perhaps most importantly, the Debtor's facility serves a particularly needy population (i.e., patients with severe psychiatric conditions) that may have trouble finding another skilled nursing facility, and to the extent they can find one, the patients may be at a greater risk if they transfer—because of a phenomenon known as transfer trauma—than if they remained at the Debtor's facility. All of this is to say that AHCA's stated intention of refusing to renew—or seeking to revoke—the Debtor's

---

[75] Doc. No. 178-1 at 21; Doc. No. 252 at 17.

license does not sound the death knell for the Debtor's business, and as such, it is not a basis for concluding the Debtor's plan is not feasible.

The Court recognizes there are cases holding that feasibility is not established when a debtor's prospects hinge on the uncertain outcome of pending litigation.[76] And it is true the Debtor's license renewal or revocation is uncertain. But what is certain is that denial of confirmation—before the Debtor has even had the opportunity to avail itself of its rights under Florida's license revocation statutes—will displace 109 nursing patients, many of whom suffer from severe psychiatric conditions and will have difficulty finding a place to go. And HHS and AHCA would be hard-pressed to argue there is harm to allow the Debtor to go forward under a confirmed plan until the licensure renewal or revocation issue is fully adjudicated considering that HHS has made no attempt to close the Debtor's facility (even though it has that right under the Medicare regulations) and AHCA has abated its efforts to do so (and allowed the Debtor to operate) since July. So while the Debtor's plan does hinge on the uncertain resolution of the pending licensure renewal or revocation action, the Court cannot allow what appears to be a litigation tactic to derail the Debtor's confirmation and displace over 100 nursing home patients.[77]

### Conclusion

The sole issue before this Court on confirmation is whether the Debtor's plan is feasible. Because the Debtor has the right to assume its Medicare provider agreement, the Court concludes the plan is feasible. And the fact that AHCA intends to seek revocation or deny

---

[76] Doc. No. 242, citing *in re Am. Capital Equip.*, 688 F.3d 145, 156 (3d Cir. 2012); *In re Ewald*, 298 B.R. 76, 82 (Bankr. E.D. Va. 2002); *In re Gregory & Parker, Inc.*, 2013 WL 2285671, at *7 (Bankr. E.D.N.C. May 23, 2013).

[77] The Court says that raising the licensure renewal or revocation appears to be a litigation tactic because, although AHCA filed its administrative complaint back in July, it did not raise revocation of the Debtor's license (which is technically separate from licensure renewal) until four months after the Court enjoined CMS from terminating the Medicare provider agreement and shortly before confirmation.

renewal of the Debtor's license does not change this Court's feasibility analysis. Accordingly, it is

**ORDERED**:

1.      The Debtor has satisfied the requirements of Bankruptcy Code § 1129 for confirming its proposed chapter 11 plan.

2.      The Debtor shall prepare a confirmation order finding that the specific requirements of Bankruptcy Code § 1129 have been met, incorporating the relevant terms of this Memorandum Opinion, and confirming the Debtor's proposed chapter 11 plan.

3.      This order is a nonfinal order and will not become a final order until entry of a confirmation order.

**DATED**: _December 31, 2014_____.

_____
Michael G. Williamson
United States Bankruptcy Judge

Attorney Elizabeth A. Green is directed to serve a copy of this order on interested parties and file a proof of service within 3 days of entry of this order.

**Elizabeth A. Green, Esq.**
**Baker & Hostetler LLP**
*Counsel for Debtor*

**Andrew Sheeran, Esq.**
*Counsel for Agency for Health Care Administration*

**Sean Flynn, Esq.**
**Office of the United States Attorney**
Counsel for U.S. Department of Health & Human Services